Call the first case. Case number 090972, consolidated with 090992, Rosenthal Collins Group v. Ford Kennelly. Would both attorneys step up and identify? Good morning, your honors. My name is Jeffrey Shulman. I'm representing Rosenthal Collins Group, or RCG as we abbreviated it. I'm Christopher King. I represent the Wolf appellants and the other appeals. My name is Scott Solver. I'm also representing Ford Kennelly. Oh, see, I thought you guys would have the several attorneys, but it's them. How are you going to break down... Judge, we've decided among ourselves since the Wolf appellants have adopted everything in RCG's brief except for the punitive damage argument that I would argue that for both of us, then they would argue their punitive damage and we would save some time for reply from each of us, if that's okay with this court. Okay. We're relatively lenient, but that doesn't mean go forever. Oh, and I know the light will go off if I use it. Okay. He's the boss of the light, not me. Okay. I never knew there was a light here. That's why he's the boss. May it please the court. As I said, my name is Jeffrey Shulman. I represent RCG, but I'm going to be arguing on the main part of the appeal for both RCG and the Wolf appellants because we have the same issues on the arbitration award, which is before the court. As your honors know from reading the briefs, we went to arbitration on Mr. Connelly's complaint believing that it was going to be conducted pursuant to the contract which we entered into, which provided that Illinois law applied, and the rules of the NFA, the National Futures Association. As the briefs point out, that is a self-regulatory body for the futures industry. They have their own rules, and their arbitrators are supposed to know their rules. In fact, one of the remarkable things about this case is when you read the authorities regarding arbitration awards and looking to whether the arbitrators knew and applied the correct law, there's always the issue, well, they had to read this case or they had to read that case. Here, the NFA puts out a manual for their own arbitrators to read and understand called Legal and Procedural Issues, and every one of the three issues that we have in this case was specifically addressed in that manual. Yet, each time the arbitration award is looked at, the arbitrators disregarded their own manual, and that manual itself, it's attached in the appendix and it's in the record. That manual not only says what the law is, but it cites cases for these arbitrators to understand, because in most arbitrations, there's at least one panel member that's not a lawyer. This one we happen to have had two, and the NFA has that. So the three tranches which make up the arbitration award against us come down to attorneys' fees, out-of-pocket losses, and compensatory damages, which included the commission's charge. And in each one of these areas, the arbitrators absolutely disregarded what the manual said, what the law says, and in one of the cases, what the NFA's interpretations of its own rules say. And what I would like to do is break those down into the three areas. Mr. Connelly began investing or trading commodities and options in 2003. He put in $10,000, then he put in another $10,000, then he put in another $15,000 or so, and at that time, he was making a little money, losing a little money. But he didn't make any money at the end. He didn't make any money at the end because... But you guys got big commissions. Well, yes, when you say you guys, as I point out in the brief, while this is a joint and several liability, the way the industry operates, RCG did not get a great amount of those commissions. Somebody got... Somebody did. Somebody got $100,000 more than he lost. That is correct. That is correct. But that was all disclosed to him. And as the briefs point out, the standard in the industry, the standard that the CFTC sets, the standard that the federal government sets in this industry is the amount of commissions, as long as it is fully disclosed and understood by the customer. It's a private agreement between the customer and the house. Can you point us to somewhere in this manual, before you get to any case law, somewhere in this manual that says that the arbitrators would not have the authority to give back those fees in the form of an award to the claimant? The manual itself does not spell out how you can arrive at a damage amount. Okay, so that's silent on it. What about, can you give us a case that says that it would be inappropriate to award for the arbitrators, that we should on appeal say that the arbitrators had no authority to do that? As specifically that reviewed whether the arbitrators could award more than the out-of-pocket losses? The brief spells out, and I will try to get to where we have it in here, that the case law has said that the proper measure of damages is out-of-pocket losses. The Supreme Court of the United States has said it, the CFTC has said it, and our own appellate courts have said it. It sounds like you want us to look at this case de novo when it's not our job. We're going over the line. Well, I would disagree with that. I think the standard is, as is argued in our brief, and disagreed to by the court. It's not de novo. You're wasting your time to argue that here. Well, I don't want to waste my time, but. Shouldn't we just, we're not authorized to vacate a judgment unless there's fraud, impartiality on the part of the arbitrators. The arbitrators exceeded their power, or they unreasonably refused to postpone a hearing, or hear material evidence, or there was no agreement. So the things you're talking about, are those errors of law? Well, specifically, I would say yes. But since you put it to me like that, I think the cases of the appellate courts here have, we have them collected in our brief and in our response, have vacated these awards of attorney's fees where they're beyond the contract of the statute. You, under question seven, when you submitted to the NFA, you admitted that you were agreeing to accept attorney's fees as an issue. That's correct. But we agreed that it would be an issue under the applicable law and the applicable standards of the NFA. The NFA, if I may, says itself. Losses plus what you guys got in fees equals the award. Plus attorney's fees are in there. Plus attorney's fees. The award is made up of three tranches. Right, but it didn't exceed, well, I'm not talking about punitive. I'm just talking about the compensatory. Did not exceed what he was out based on his ballgame with your client. I would disagree with that. $385,000. He's out $150,000. That's what he put in. Well, he's out the $240,000 that he had to pay in fees and commissions, too. And if there were no fees and commissions charged, he would have never made any trades. And that is exactly, by the way, that is exactly, I believe, the only case that was cited in the response brief. I guess what I'm looking for, and I can't speak for my colleagues here, but I'm looking for something from you on this particular issue that says that the arbitrators had no authority to give back the commissions, fees, whatever you want to call them, that were part of the award here. Well, I believe that starting on page 21 of our brief where we list the cases, including the CFTC cases, where it says the calculation of damages should focus on the out-of-pocket losses. That is the calculation of out-of-pocket losses. All right? And the only case that the Kennelly has come up with that seems to have some disagreement with that is he cites the, I believe it's pronounced Miley case, and that's a case where a court said that. How do you spell that? Which case is that? M-I-L-E-Y. I respond to it at page 10 of our reply brief. It was a federal district court case. And in that case, there was a component of damages that exceeded the out-of-pocket losses. It was some of the commissions. And what happened in that case was it was a churning case, which respectfully, we don't have churning here under the rules, under the NFA rules. This was not a discretionary account, and that's discussed in our brief too. Mr. Kennelly made every one of his trading decisions. He said yay or nay on every trade. And in the Miley case, they found it was a churning case. And after the jury found it was a churning case, they said you can include some of the commissions, but you can't include all of the commissions because that's unrealistic. And that's the point that happened here. If a commission was never charged, Mr. Kennelly would have put in his what came to be $150,000, and it would have been $150,000 at the end. And what we're really looking at here is not one of these cases where a customer put his money in, the account got traded very actively over a two- or three-month period, never showed a profit, and he lost it. If that was the fact situation, we might have something akin to this Miley case here. But we don't have that. So what you're saying is that they shouldn't be entitled to, in essence, disgorgement. That's correct. We've said that in our brief, and I think that's what the case law is consistent with, is consistent with in measuring this. Because don't forget, at one time in this case, Mr. Kennelly had a 220% profit. He had approximately $50,000 in, and he had made over $160,000 after all the commissions had been charged to that point. Well, you know, that certainly is true. I mean, that's inarguable. But based on what the arbitrators came back with, which we have to give a lot of deference to, even more deference than to a trial court under the law of the state, it appears that the arbitrators were not all that impressed with the conduct of your client here. Well, since I'm arguing for both of us, I just want to know. They were not proud of the conduct of the parties, but when you said my client, my client RCG, although I'm arguing for both of us, my client RCG was the clearing broker. We had one conversation with Mr. Kennelly, which we weren't even required to do. We gave him all the required mandated federal disclosures as to the riskiness that he was getting involved. And he signed off and said, I understood it. And he even told us in that one conversation that he understood what was going on. No, I didn't mean to provoke you, counsel. No, I didn't mean to provoke. But what I said, weren't impressed with my client. The point I'm trying to make here is that case law is clear that we have to give a lot of deference to an arbitrator's award and even more than a trial court's award. And under the facts of this particular arbitration, it seems like the arbitrators in this case were not at all persuaded that either your party or the other party here arguing on appeal had anything to stand on. I'm just saying it appears when all three unanimously agree on each, usually one or two would disagree on one of the issues. But here it's unanimous. And that doesn't mean that all three of them can be wrong, cannot be wrong. And specifically, what is perhaps arguable under the standards that you've now told me, that it's deferential instead of de novo. Yes. Under that standard, the $150,000 is arguably off the table. But the other two aren't, especially the attorney's fees issue, especially the attorney's fees issues. How can those arbitrators sit there and say this is arbitrated under Illinois law, the contract provides for it, there is no contractual provision for attorney's fees, there is no statutory provision in Illinois for attorney's fees, and by the way, the NFA has told us that we have to find the statute, we have to find a contract, we have to abide by the party's contract, and if we ever do get to the attorney's fee issue, we have to have some showing of what those fees are. Which they thought was bad faith on the part of someone. I'm not pointing at you or him. I disagree with that. That's the argument. The argument is since the only conceivable problem is there could be bad faith as raised, certainly not by the arbitrators. The arbitrators made no determination specifically against RCG and, I submit, even against Mr. Wolf, who they did award punitive damages against, at the hearing. It's quite in there. When the chairman tells you you're real pros, there was no problem with this, how can you take it that there's now bad faith for somebody defending. Weren't they referring to the lawyers who conducted the arbitration more than the parties? I would hope so. I mean, it certainly struck me that way. I would hope so. You took one comment out of context, put it in your brief, and to me it read like the arbitrators were giving a pat on the back to the lawyers who presented the case in front of them, not the parties. But what did my clients specifically do in bad faith? Defend the case that was brought against them? And if I didn't do anything to provoke them, then how could my client have done anything to provoke them? We defended the case. Somebody brought an arbitration against us. We defended it. We gave them our defense. We lost. We posted our bond, as we were required to do, which is still out. How could we have acted in bad faith? And the bad faith you're talking about refers just to the attorney's fees because you didn't get hit for punitive damages. That's correct. That's correct. So as far as RCG, I don't see how there can be the statement that the attorney's fee provision could go under the bad faith. And anyway, it's an Indiana statute. Where does that come from? Where's Mr. Connelly from? Mr. Connelly lives in Indiana, but he's … Where does Mr. Maddox come from? Mr. Maddox comes from Indiana. So? But the contract says apply Illinois law. Isn't there? It's basically the same if you are under NAFTA. Basically the same? There is no Illinois statute that would provide that. But it's similar language under NAFTA. Okay. But he didn't cite that. We're now assuming that if he would have known it, he would have cited it. Well, we're playing with semantics now. He's on to something factual. What standard would you have us to review that finding under? I would have the same standard that the case law. There's about a half a dozen cases in here, including Stern and everything, that say if there's no statutory or contractual … But the NFA says … Which is exactly what the NFA says. But the NFA says that the attorney's fees can be attributed to bad faith. That gets back to the fact that we are assuming, at least against my client … But that was a mistake. They mistakenly … I can't say if it was a mistake. I don't know what was in her mind, but it certainly isn't supported by the record. That's what I can say. I can't see what's in their mind. I saw what was in Arbitrator McMahon's mind when she sat there and berated RCG's witnesses for not following regulations that the NFA said don't exist. I know what was in her mind. And that's why we say she did not exhibit partiality. But I don't know what was in their minds about the attorney's fees. It was never discussed. But what you're saying is that since the arbitrators applied Indiana law, where the contract says Illinois law, that's clearly a mistake and it ought to be thrown out on that basis. On that basis. At least that portion of the law. And then the next step, and correct me if I'm wrong, you're arguing that even if we were to sort of forgive and forget that mistake, then there's no basis shown in the record here for bad faith in awarding the fees. There isn't. I'm just trying to make sure that that's what your argument is in sequence here. That's the RCG. I would like to spend the last couple of minutes, if the panel doesn't have any other questions on these issues we've discussed, talking about what I believe coming in is the cross-appeal, which, as Kennelly says, you don't have to get to if you're not going to vacate any of the award. But I believe that at least the attorney's fees and the compensatory damages, under any standard, should be vacated. Do you believe the punitive stand? I'm not the punitive person. I'm not the punitive person. Mr. King will, I'm sure, admirably address that question, so I don't have to answer that one. Here is the thing on the cross-appeal. The basis of the cross-appeal is that the 90 days in the Arbitration Act is jurisdiction, and you can't do anything to get around it. I have, in our brief, we have all these Illinois Supreme Court cases within the last 10 years, which have sort of just said, except in administrative review, the circuit court has jurisdiction over anything that the legislature creates, and that those time periods in those statutes are nothing more than statutes of limitations. In response to that, all Mr. Connelly could say, or his counsel actually, would say is let's go back to some case law before that, and by the way, a couple of judges on a panel of an appellate court, happens to be the Fourth Circuit here, were questioning the wisdom of the Supreme Court. Now, that statement in and of itself is remarkable, but I would point to the panel that the case which they cite for that remarkable observance, Ingray-Gilberto, actually what the concurrence was doing was supporting the position that I made, and I'd just like to spend a minute to read it to you, because I didn't get a chance to put this down on paper. And this is the concurrence which they say is questioning the Supreme Court. It says, I find the majority's reliance on Ingray-O somewhat problematical. Relying on that case, the majority states, our legislature may define a justiciable matter in such a way as to preclude or limit the authority of the circuit court. This position is on its face at odds with cases like Steinbarker, Bellevue-Toyota, Village of Lake Bluff, which hold that with the exception of administrative review, the jurisdiction of the circuit courts is conferred by the state constitution. And it said, I think it is no longer appropriate to say that the legislature may define the justiciable matter in such a way as to preclude or limit the authority of the circuit courts. That's exactly what Connelly's attorneys argued. That the 90-day limitation somehow is a jurisdictional matter, that Section 217 doesn't save it. This court in this Burling case has already decided that 217 could even save administrative review delays. And so I think that, as I would urge the panel, that at least a great majority of the arbitration award should be vacated. That Judge Martin, while he was wrong on that one, was right in the fact that RCG's petition to vacate was timely. The other thing that is in the briefs back and forth is this question of sanctions. Again, I get accused or requested sanctions for appealing. Not one of the cases that Connelly's attorney cites, and it looks like there's well over a dozen cases where the Illinois Appellate Courts or the Illinois Supreme Court has had these issues. Has had these issues of attorneys appealing the refusal to vacate arbitration awards or the confirmation of arbitration awards. And not one of those cases has anybody ever been awarded sanctions for exercising the appellate rights. That didn't stop you from asking us to sanction them for filing a frivolous cross appeal. Only on the cross appeal. On the cross appeal because of the reasons I stated. Their argument is that there was no jurisdiction because of the timeliness. They totally disregarded all these Supreme Court cases that have been within the last ten years and started citing to you from cases back from the 1850s. And then in response to that, what do they tell us? That a couple of judges in a concurring opinion have questioned the wisdom of the Supreme Court. That, in my opinion, warrants what maybe is hubris going back and saying, well, if you're going to accuse me, I'm going to accuse you. But that's all I accuse them of. And they didn't have a response to it. My response is the case law is clear on the jurisdictional issue. You said it, counsel. I think it appears that Your Honor doesn't want me to have anything else to say on that, so I will stop. Well, we've got to let him. Right. Thanks. Good morning. Christopher King on behalf of the Wolf Parties. And I would like to talk about punitive damages. And punitive damages is not an issue that deals with the merits of this case. It deals with a question of arbitrability. And it deals specifically with what is the scope of the arbitration agreement? What did the parties specifically submit to the arbitrator? And our position on this is we would have won this argument in front of the trial court had he applied the correct standard. And it is, in this instance, a de novo standard of review. The Solstice case specifically holds that, as did the Rubic case. They held that issues of punitive damages is an issue of arbitrability. And the court is going to look to see whether this was properly submitted. And the trial court looked at this and said, I've got concerns with punitive damages. Because he understands, under Illinois law, there has to be, which is distinguished from a lot of other states, there has to be an express agreement in the arbitration agreement, an express provision granting the arbitrators the right to award punitive damages. And we don't have that here. And they've not argued that there's anything in our agreements that mentions punitive damages or is a provision that authorizes arbitrators to award punitive damages. How do you get past the Serejewski case? The Serejewski case was dealing with the NASD, an NASD rule. And they had the lower court Rubic case basically saying, NASD rules, this is under the FAA. And under the FAA is a totally different set of presumptions when it comes to Illinois law. And my best answer is, look, they were stuck with Rubic. But my case is Ryan. And Ryan distinguished Rubic and said, we're not under the FAA. And this isn't an NASD rule. And the other point I would make about that is, look, Ryan was dealing with the AAA. We've got a lot of alphabet here. I'm going to throw some more in. Isn't there something from the NFA that says that this type of arbitration of punitive damages would be appropriate? Well, here's what we have. Nothing like the NASD rule. Nothing like the AAA rule. We have a fee schedule. And that's what the only thing that people have pointed to in saying, well, here's punitive damage mentioned, is the NFA fee schedule. And what the fee schedule says is, here's a schedule of how you determine your form fees. When you file your NFA arbitration, look at this grid. And we calculate it by the damages that you see and include any claim for punitive damages. The problem with that is, it's not saying, here's the relief that any NFA arbitrator can award, number one. And it doesn't mention anything in terms of whether the parties agreed to have punitive damages. Shame on you for not up front, or not you, whoever represented them, not clarifying that up front. Well, here's the issue, though. When they filed their NFA claim, there was no claim for punitive damages. But Canelli says he's seeking them. The very first mention of punitive damages is in the opening statement. And I think if we looked at the record, our guys stood up and did object to them seeking new relief. And I would argue that we could include punitive damages in that. We don't think that that was fair notice. I'm sorry to interrupt, but what should they have done, in your judgment, in order to preserve their right to ask for punitive damages when filing the claim? That's right. I think that you have to state it in the statement of claim. And what he asked for here was the $150,000, right? They asked for $250,000 total in their statement of claim. And the NFA submission agreement even prompts them. It even says, include all of your damages, including exemplary and punitive damages. They didn't seek it. So I think they got a couple of problems here. And we've argued it all both in our brief, which is none of this qualifies as an express agreement, certainly under the analysis of Ryan, which is express means express. It's got to be we want you arbitrators to decide the issue of punitive damages. And the second level is they didn't ask for it. And there are due process issues here. Connelly points to this NFA arbitration manual, which directs the parties, if they disagree that punitive damages should be allowed, that you file a brief to support your argument. That's exactly right. And we didn't have the opportunity to do that because we were in the middle of the hearing when we learned that this claim was going to be asserted for the first time. And to get back to your question, what if they had submitted this in their original statement of claim? Then we could have asserted a brief. Then we could have briefed this issue. And this could have all been fleshed out. But we didn't get the opportunity to do that because suddenly we were in the middle of a hearing and they're asking for it for the first time. So there is that prejudice. So our position is, look, we think the analysis of Ryan controls. Express means express. And we think that the holding of that case basically means if you have to make any inference at all that punitive damages are included in the rules, then they're out. Because an inference isn't an express agreement. So we would ask that you vacate or reverse the trial court because they didn't apply the de novo standard. The trial court's instincts were right that there are problems with punitive damages. And reverse that part of the award. And I'll rely on my brief and the arguments that you've heard before on the other issues. Except let me just say one thing. We do have an issue with respect to Mr. Maddox. And that's an issue that has to do with his disclosures under the NFA rules. He was required to disclose anything that might be. I thought by that you could Google and know everything and probably would know most of them. And you don't research before you accept? Well, I was not the lawyer at the arbitration. No, I understand. I appreciate your Honor's question. And we've certainly heard that argument. And my position is, look, the NFA rules put the burden on the arbitrators to make the disclosures. And it's their obligation to do so. We got a late disclosure of Mr. Maddox. We got bare bones information. And there was some stuff that we couldn't have found out just by Googling his name. We couldn't have known that the percentage of his law firm was 80 to 85 percent of his business comes from suing brokers. We couldn't have known that he wrote a book, which is essentially a how-to manual on how to sue your broker. But that you should have known. And we think that, look, there's an NFA rule that's involved here. He didn't comply with it. And it did prejudice us because under the NFA rules, it's hard to get arbitrators kicked off. This isn't like picking a jury where people agree. They're appointed. And you can only disqualify them for cause. And under his disclosures, we didn't really have cause. But we think had we known the truth, we would have, and we could have made that motion. So that's our argument. Punitive damages, we believe, should be reversed and vacated. And the issue with Mr. Maddox would vitiate the entire award as well. Thank you. Thank you. May it please the Court. My name is Scott Solver. I represent the appellee, Ford Kennelly. Arbitration is meant to be a fast, expeditious process where a quick resolution can be reached for a dispute. The court must construe the awards to all public validity. An award can only be vacated when in the face of that award, there is clear mistake of error in the law. Not only manifest disregard of the law would not even suffice to vacate an award, they would need to demonstrate that the arbitrators knew the law and intentionally ignored that law. They've raised a panoply of issues in their briefs and before the Court today. So I'll try to address a few of them quickly. First is as to the issues about the arbitrators. Three arbitrators qualified under the NFA to serve, who did not know each other, reached a unanimous decision in this case. They attacked the arbitrators, but they need to demonstrate that these arbitrators had either a direct or financial interest in the outcome of this arbitration. What about the alleged 85% of his businesses? The NFA recruits arbitrators just like Mr. Maddox from both sides of the industry. Claims attorneys, defense counsel, people with experience in this niche. Learning what he does for a living was as easy as a Google search. They provided Mr. Maddox's bio and background, compliant with NFA rules. They said he is the management partner of Maddox Kohler. Simply looking up his law firm, the domain name was Investor Protection. It is on his website exactly what he does for a living. He then discloses to the parties that he has met my partner, who had tried the underlying case, at several industry conferences. And again, they don't raise any questions. They confirm that they accept Mr. Maddox both on initial calls and then at the start of the hearing. The parties are asked, do you accept the composition of the panel? They accept Mr. Maddox as an arbitrator without reservation and without question. So the extent that Mr. Maddox did fully disclose any potential bias in that he had met claimants counsel in the past certainly didn't reach a standard for disqualification. And he had no interest, financial or otherwise, in the outcome of this arbitration claim. So the simple fact that he represents plaintiffs in arbitration claims is no different than we routinely see defense counsel serving as arbitrators as well on these cases. Do we know what the other two are? Arbitrator McMahon was an industry professional. She had worked at Shearson Lehman for several decades. She held a commodities license herself. And the third arbitrator, I am not as familiar as I stand here about his background. So it may have been evenly balanced. Absolutely. Why don't you tell us why you believe that it was appropriate for the arbitrators to essentially disgorge all of the fees here in addition to the losses that this man suffered? Because that was the claims that were made here in this arbitration. That was the dispute submitted to them, that the respondents in this case had engaged in a course of conduct to generate fees and commissions for themselves in disregard of the claimant's best interest. We submitted the factual arguments of the panel and case law which supports. And I would go to respondent's reply brief here in this case itself, Kayson v. Castle Commodities, which discusses this exact issue. In the damages section of that case, this was a case decided by the CFTC. And this is why it's actually cited in our brief and in RCG's brief as well, where the investor was awarded more than his out-of-pocket losses. And the decision of that case says, Complaints that kind of include his initial investment and substantial profits. The profits were no less the property than his initial investment and constitute part of his total damages. We believe this is a red herring argument being submitted by the appellants in this case. There is no case law that supports the position that if an account is profitable, a brokerage firm can take those profits through misconduct and keep it for themselves with impunity. There is ample case law, the Miley v. Oppenheimer case cited in our brief. We use it because it is a leading case on topic and shrinksites the jurisdictions coast-to-coast that stand for this proposition. But even if this was not the standard, the case law in this country, the issue before the court, the standard of review here, is did the arbitrators know the law and intentionally disregard that law? Here, not only did they disregard the law, they followed the law to a T, when a claim for excessive fees and commissions is made. And it is within the monopoly of damages that they could award to an investor those excessive fees and commissions. How do you go from a claim filed by Mr. Cannelli for $250,000 to an award of $543,000? Help us there. How is that appropriate under the circumstances of this case and the law that you cite, that you go from a written claim, I want $250,000 from these guys, and they come back with $543,000 before we even get to the subject of punitive damages? Sure. The compensatory damages in this case, although our initial claim form, we lay out the facts and the basic damages that we're going to be seeking, we say the number of $250,000. However, as the evidence comes together and as we presented to the hearing panel and in our briefs beforehand, we say his damages are not only his initial investment of $150,000, but due to their misconduct, their profits of $250,000 in commissions. And they therefore reach a compensatory award of approximately $385,000. But if they're on the receiving end of a claim and it says in written form, we're looking for $250,000 from you folks, and at the end of the proceeding they walk out $1.2 million poorer, you can understand that there might be some problems with communication here. Even the claim form itself says that we're going to be seeking attorney's fees on top of the compensatories. That's how we reached the $500,000 change. And the forum that we're in, a businessman's forum, to reach disputes without the formalities of court, the arbitrators were allowed to award damages as they felt that the evidence and the facts allowed. And here in this case, we argued, if not initially, as the case progressed, and certainly as we got to the hearing, we said, we're going to be seeking not only the compensatory and attorney's fees, but we will also be seeking punitive damages. If you could edify me and tell me where in the record there was some communication to the other side here. Between the time that the $250,000 claim was filed and the time that, I don't know if it was you, counsel stood up and said, and by the way, in opening statement, we want punitive damages. Can you tell me anywhere within that period of time, something from the record that would establish that you sort of beefed up what it was you're going to be asking for at the arbitration? There was a 30 days prior to the final hearing, pre-hearing exchange that lays out the theories of the claim and what's going to be sought. I don't know if it lays out the damages exactly as the panels awarded it here in this case, but it certainly lays out. Which is a broad subject. Did it include disgorgement? Did it include attorney's fees? And number three, did it include punitive damages? They have communication 30 days before everybody appears for the arbitration hearing. The disgorgement and commissions and fees are all laid out. I believe it is silent as to the punitive damages issue. All right. Thank you. Using that as an opportunity, I'll turn my attention first to the attorney's fees issue here in this case. I do believe it's important that the attorney's fees were awarded on this case based upon a finding by the entire panel that the respondent's defense was either in bad faith and or frivolous. And I believe Your Honor hit it on the head earlier. It wasn't counsel who engaged in bad faith. Everybody had been represented by competent counsel in this matter. But the defenses raised and the testimony of the underlying respondents in this case rose to the level of bad faith or frivolous as found by the panel here in this case. And the NFA code of arbitration allows attorney's fees to be awarded if that is the substantive belief of the arbitrators. Then as to the punitive damage award. But how about Indiana versus Illinois? I mean, shouldn't they have known that Indiana law does not apply? And isn't that the kind of mistake that we should just, you know, latch on to and say that they were wrong to give attorney's fees on an Indiana statute where the contract clearly says Illinois? No, because the standard here is whether or not is to give, find a favor of the arbitration award itself. And here, while they cite it to an Indiana statute, we have three arbitrators, only one of which is an attorney, none of whom which have the training and additional experience as we see here today, that its initial form over substance. The same Indiana statute that they cite is the intent of a language, the NFA code of arbitration. Right. So that should be enough. I understand what you're saying, and I agree in terms of the deference we have to give. So it's just paraphrase of the other. Because it finds exactly what they could have found under the NFA code. The NFA code allows them to award attorney's fees for finding a bad faith or frivolous, and that's exactly what they state in their final award in this case. So basically the party that Grant brought that forth was obviously the one from Indiana. That is the presumption of everybody, I believe. You just said, I think, and correct me if I'm wrong, that they found that there was bad faith or frivolous. Is there a specific finding in that regard that you could direct me to? Well, they cite to the statute, and we have in our brief the language of the statute. And that's the Indiana statute that says attorney's fees may be awarded for a party who litigates in bad faith or advances a frivolous argument. No, I understand that. And that's both in the NFA and, as you say, it's in the Indiana statute. My question is, in the arbitrator's award here where they come out and they say you're going to get, you're going to pay this much and that much and $750,000 in punitive damages, was there a specific finding somewhere that said that they acted in bad faith in that they, you know, No, I believe the final award simply states we award attorney's fees pursuant to Indiana statute. The amount of the fees, they were awarded 40% of the award rather than an hourly breakdown on the amount, breakdown of the time spent. It is alleged that is an improper award for that reason. And in a court of law, certain procedural rules must be followed. Here in an arbitration proceeding, the argument was made that the attorney's fees should be awarded pursuant to the contract between Mr. Kennelly and his counsel. And the argument raised by defense counsel was simply that an award of attorney's fees would be unreasonable in this case, but not arguing that those certain procedural niceties need to be followed. Again, the standard to look at that is whether or not they knew what the law required and they intentionally disregarded that law. Here the argument was made that attorney's fees could reasonably be based upon Mr. Kennelly's obligations to counsel. And the three arbitrators accepted that argument and awarded fees on that basis. And there is no evidence to support that they either knew the law to be to the contrary or that they disregarded that law. Turning to the issue of punitive damages here in this case, there is no dispute that Mr. Kennelly raised the issue of punitive damages certainly at his opening statement, again raised it again in his closing arguments. The respondent's arguments prior to the initial award being rendered was that punitive damages aren't warranted here in this case. But the first issue raised by Mr. Wolf is that the issue of is there an express provision allowing for an award of punitive damages? Is it in the contract? And it is. It can't be disputed. It's in the NFA code. It specifically says that the NFA arbitrators may award punitive damages. That's an express provision in the NFA. But is there an express provision in the contract between your client and this broker that would suggest that punitive damages could be recovered in the event of a dispute? No. And that's exactly what Sijerski and the other cases discussed, that you don't look only at that initial contract. But when that initial contract says that we're going to arbitrate pursuant to the rules of a particular forum, you look to the rules of that forum. Here, Sijerski specifically says that the arbitrators may award attorney's fees. The Ryan case, which the Mr. Wolf... We're on punitive damages now, which is a different breed of cat. In talking about punitive damages, there was no express provision in the contract between Mr. Canelli and the broker that said that in the event of a dispute, there could be punitive damages obtained. Yes. And in the Sijerski case, which does go to the punitive damage issue, they say you look at the rules of the forum. In the Ryan case, which is what Mr. Wolfville relies upon, it said that we're going to look at the rules of the AAA. The rules of the AAA, if you look at the Ryan case, is completely silent on the issue of punitive damages. It doesn't say whether the arbitrators may or may not award them. So in Ryan, the court says that if your agreement and the rules of your forum are silent as to the issue of punitive damages, then the arbitrators do not have that express provision allowing, giving them the right to award punitive damages. Here, in the NFA, similar to Sijerski, which regulates the securities industry, the NFA, which runs the arbitration forum for the commodities industry, expressly gives this power to the arbitrators. But where? Where? Where to say that in Sijerski? No, where do the arbitrators have the authority in this case to give punitive damages? I know you point to Section 11A, which is a fee schedule, right? Yes, but I would also point to the legal and procedures issues for NFA arbitrators, which is in the… That's a manual. Is that manual part of the agreement between the parties? I would argue that it is because the manual is what is relied upon by all arbitrators to render their decisions. That's an instruction book to the arbitrators. Is that part of the agreement between the parties? Don't they sign a document initially that says you're subject to those rules? To the rules of the forum, and this is the book that explains what the rules of the forum are. We agree to submit any old disputes to NFA dispute resolution and to follow the rules of that forum. And the rules, according to you, counsel, would allow the claimant here to have his attorney not say a syllable about punitive damages until opening statement of the arbitration proceeding? Yes, Your Honor. Does it strike you as a bit of a sucker punch? No. They had every opportunity to present their arguments to the panel, both throughout the course of the arbitration proceeding and in post-hearing briefs. How much time, if you could indulge me, how much time elapsed from the time of the first claim where your client asked for $250,000 and when the arbitration hearing itself started? Well, he makes the argument at... What I mean is how much time passed between those two points in time? The filing of the claim and the hearing? I'm estimating 12 months. Okay. And during that 12-month period of time, I take it that there was a lot of activity, both in court with the case moving around and a lot of correspondence back and forth between counsel? Not in the underlying arbitration. From the time of the filing of the initial claim, we had limited paper discovery, which is all that the rules of the forum allow. The parties exchanged their hearing plans about 30 days for the hearing. There was one adjournment of the final hearing. And then the case advanced to a final hearing. The rules of the forum are much more relaxed than you have in a judicial setting. The arbitrators come in and they basically hear the facts from both sides, and they are allowed to render an award as they see fit under the facts presented to them. They are not limited by the initial filing of the claim. It's more akin to the award performing to the evidence that is presented to them during the course. Why shouldn't they, though, be limited to everything that's presented to the opposing side as of the date that you stand up and give your opening statement? Why should an issue as important as punitive damages be sort of hidden in a back pocket before you stand up and open a statement? Why should it be that relaxed? Why should we permit that? Because they had their opportunities to present their defenses to this arbitration panel. They have opportunities to submit their briefs. They had their opportunity post-hearing to submit additional papers to the panel. They presented their arguments to these arbitrators. They considered those arguments, and they let their decision stand. Did the arbitrators ever ask the parties to address the issue of punitive damages? Outside of allowing arguments to close an argument? No. Anything further? Turning to the cross-appeal on this case. It is our position that under the Illinois Arbitration Act, you have 90 days to file a motion to vacate absent some form of fraud or corruption. The appellants in this case spend a lot of time trying to distinguish between an application and an action. The motion to vacate is an application. The action in this case was the actual arbitration claim. We believe it's a simple, straightforward issue that the time to file under the Illinois Act is 90 days and that the filing of the federal court action, whether in Illinois or anywhere else, does not stop, hold, or delay that timeline. Thank you. Your Honors, I would just like to make what I think I've broken down into four points to respond. First of all, I believe Judge House, you asked the question of regarding what would be done in an arbitration proceeding regarding the awarding of attorney's fees. And the response was you don't have the power to do that. That is completely false. At both pages 28 of our brief and page 7 of our reply, we quote from the NFA manual. This is the manual they're supposed to have read, by the way. It says, before awarding attorney's fees, the arbitrator should request a detailed account of the attorney's time and expenses broken down by categories. The detailed amount should show who put in the hours, and the party requested the fees should specify an hourly rate for each individual. That's the procedural niceties that the NFA requires their own arbitrators to do, and these arbitrators sat there and thumbed their nose at that, like they did at everything else that the NFA told them in the manual. And this argument that I think it's Rule 12 of the NFA manual is comparable to the Indiana statute. Well, why didn't we have a discussion of this under Rule 12? Why, when the arbitrators were given two chances, they never mentioned Rule 12? And I submit to you because if they would have gone under Rule 12, it would have dawned on them that they had to have a breakdown, and they didn't bother to do that. So this equating the Rule 12 to the Indiana statute and saying, well, they're the same thing, is just illogical. And they disregarded their own manual on that point. The other point that was raised was the Kassim case regarding how you measure compensatory damages. We discussed that in our brief, too. It's in page 10 of the reply. And that case said about the same thing that the court said in the Miley case, that if you get the right set of circumstances, you might be able to disgorge some of the commissions, and we're really not going to do it here because it's still the measure out-of-pocket damages. So the two cases that they came up with saying that they should get all their commissions back don't even support that. So I again submit to the panel that this disgorgement argument is just incorrect, was not submitted to the panel, and by going that route, they exceeded their authority. Plus, if I can jump in because I see, Judge, you have a question coming up. If we were at the hearing thinking of we're going to get hit for some of the commissions in excess, what's the number that we're hearing? $100,000 because they are claiming $250,000, out-of-pocket $150,000, and then $250,000 total claim. So we're thinking, okay, somewhere in there they're going to point out where we did something wrong to match the specifically commissions. That's what we don't get. We get all of a sudden another $150,000 on top of that, which is every dime that this man ever paid in commissions, and a lot of it was in fees, by the way. But counsel, with all due respect, in the award, the specific award at page A63, your appendix here, it says that the following issues were presented by the parties and decided by the undersigned arbitrators. Churning, misrepresentation, high-pressure sales, failure to disclose risk, failure to supervise, unsuitability, omissions of fact, failure to hedge, mismanagement, excessive commission, failure to comply with industry rules, and then they go on to claimant's request for interest, punitive damages, cost of attorney's fees. So it would appear, to us at least, as an appellate court giving deference, as we should under the case law, great deference to the arbitration award here, it does appear that the arbitrators found that there were some significant examples of malfeasance here. Maybe not your client. Maybe Mr. Wolf. Because when you throw around terms like churning, misrepresentation, high-pressure sales, it sounds like they're impressed by some bad conduct here. Well, I would just point out, you sort of jumped my next argument, which was counsel stood up there and said, it was submitted to the arbitrators because of our bad conduct and unsuitability. Every one of these, and it's all detailed in our brief, by the way, every one of those issues is not an issue that the arbitrators could have held against us. There was no suitability requirement in commodities. Churning, we couldn't have been guilty for churning. We didn't have discretion over the account. High-pressure salesmanship, there is no such charge against us. We weren't the salesman. Excessive commissions, as I pointed out, the NFA says that the commissions are negotiable between the customer and the house. So you think they just made it up in their award? Well, I don't know. We're just trying to look at it. I don't know. I don't know. I was there, unfortunately. I was there for two days. I don't know what went through their mind. But I can tell you that when you read the record in these arguments, it was, as I said, and I'll paraphrase myself, there are rules that are being applied in that hearing room that don't exist anywhere else and don't exist in the industry. Okay? And that's exactly what happened. McMahon's conduct is the most glaring example in the record. Counsel, let's move on. Okay. I have my last point. There is another case. Okay. You're getting a little antsy. No, I apologize, Judge. My last point was going to be, I've heard now three or four times with the standard review, I would just urge this that the cases that I've collected at page 10 of my reply as to why I believe that the standard should be they don't. And that was my last point, unless you have any other questions. Thank you. Thank you. We'll take it under advisement, and we'll let you know whether